UNITED STATES DISTRICT COURT       SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DAIV KA' SHOBA SUNDOWN, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | CIVIL ACTION H-07-1441 |
| | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE-CORRECTIONAL, | § | |
| | § | |
| Defendant. | § | |

## Opinion on Denial

1.     *Introduction.*

      Five felons have sued the Texas prison system about a variety of abuses and neglects of their opportunities to worship as they would like while in prison. They lose.

2.     *Parties.*

      The plaintiffs are: (a) Daiv Ka' Shoba Sundown, (b) R. White Eagle Otto, (c) Lewis Allen Wright, (d) Brandy Holds-Head Proud-Wombyn Maynard, and (e) Patricia Crying Wind Carmen. They have sued the Texas Department of Criminal Justice-Correctional Institutions Division. Otto, Wright, and Proud-Wombyn are prisoners. Texas has released Sundown and Carmen from prison. Sundown now lives in El Paso, and Carmen lives in Massapequa, New York.

3.     *Claims*

      The plaintiffs seek relief under this court's judgment in *Hyde v. TDCJ* (H-94-2987). *Hyde v. TDCJ*, 948 F. Supp. 625 (S.D.Tex. 1996). They say that, with them, Texas has not obeyed the judgment. They say that prison officials deny them weekly religious study and worship for want of Native American religious volunteers. They also raise retaliation, discrimination, and errors by guards about who should conduct their religious meetings.

4.    *Religion in Prison.*

The plaintiffs maintain that the Constitution requires state prisons to accommodate all religious groups. They contend their religious needs and practices are parallel to Jehovah's Witnesses who succeeded in an earlier case.

This court's earlier judgment says:

1.    Hyde will be allowed by the prison to attend religious meetings of Jehovah's Witnesses on the same conditions as adherents to other similarly situated groups . . .

A.    When it is consistent with sound, legitimate prison management, Hyde and other Jehovah's Witnesses may meet when fewer than fifteen . . . are attending if other religious groups are allowed to meet in groups smaller than fifteen . . . .

B.    When it is consistent with sound, legitimate prison management, Hyde and other Jehovah's Witnesses may meet without an approved religious volunteer to conduct the meeting if none is reasonably available to attend a regularly scheduled meeting.

*Hyde*, 948 F.Supp. at 626-27.

5.    *Rule 71.*

The law says "when an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." When a person who was not a party seeks to enforce an order, he must have standing. "Rule 71 was intended to assure that process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action." *Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2nd Cir. 1977)).

Because the *Hyde* decision is not in favor of these people and it does not directly affect them, they have no standing to enforce another person's success. On the other hand, in the course of vindicating Hyde's rights, the decision did apply the Constitution to a situation, making it persuasive in parallel situations. *See Floyd v. Ortiz*, 300 F.3d 1223, 1226 (10th Cir. 2002). These plaintiffs cannot directly enforce the judgment in *Hyde* to their benefit against Texas.

6.      *Specific Relief*

Treating this suit as an independent claim for individual relief, the plaintiffs have requested: (a) an extension of the holding in *Hyde* to these Indian prisoners; (b) the imposition of sanctions for criminal contempt, including compensation for the plaintiffs for years of personal injury; and (c) modification of the judgment to create a class of Indian prisoners.

7.      *Indians, Religions, and Prisons.*

The plaintiffs combine pre-Columbian cultures that covered the continent with groups who were as often mortal enemies and allies. They treat as unitary cultures whose treatment of marriage, territorial or migratory residence, kinship recognition, and other social constructs were sometimes parallel and often conflicting.

They conflate the religious traditions of a variety of belief and ceremony.  Historic Indian religion was more varied than the bewildering array of traditions within Christianity. Most cultures dance; they dance for religious and secular reasons.  Just as the government's defining who may be a real Indian is an act of politics, defining what is a real religion is politics. Texas cannot determine who is an authentic Lakota or Iriquois any more than it can know who is a real Episcopalian or Thai.  For jurisdiction in tribal courts, inheriting, and participating in benefits, the government uses tests that are as arbitrary as those used in anti-black laws.  *See Plessy v. Ferguson*, 163 U.S. 537 (1896).

These people may adhere to the religious tradition of their choice or may discover a new one.  They may practice that choice without interference from the government, except that religious individuals and bodies must obey legitimate laws of general application to people who are factually in the same position irrespective of religious motivation.  Speed limits, occupancy limits, and building codes are obvious examples. These people – whether they are really Indians or whether their religion is authentic – may believe and practice consistent with objective requirements of other laws.  That is the difficulty.

8.      *The Constitution.*

Individual choices of beliefs and especially individual expressions of adherence are protected from governmental interference or assistance.  The Texas and national Constitutions say that.  Congress had no constitutional authority to adopt its act on "Religious Land Use and Institutionalized Persons."  What protection it could afford was already in the Constitution.

Its statute either attempts to affect the establishment or free exercise of religion or it is wholly empty. The act's unnatural parentage is revealed by the jurisdictional recitation that the things it covered must either burden a program receiving federal assistance or burden interstate or foreign commerce – religion as commerce. *See* 42 U.S.C. § 2000-cc-1(b).

Legitimate, secular governmental interests affect the opportunities for free exercise of one's conscience. Soldiers have all of their freedoms severely curtailed so that we all may enjoy ours more fully. At the opposite end of society, prisoners have their freedoms restricted as a direct consequence of their choices. The limits on their opportunities for religious expression are a natural consequence of their general forfeiture of liberty and of the practicalities of their confinement. Between soldiers and prisoners are people in mental hospitals and other non-punitive custody. The government may fund chaplains for them and the Constitution forbids either indoctrination or disruption of matters of conscience on those grounds – expressly or deviously.

As applied to prisons, the Supreme Court apparently reaches the conclusion that it restates the constitutional limit rather than imposing something new and, consequently, is not offensive to the First Amendment. That is empty does not necessarily make it constitutional. Congress "found" that guards have gratuitously interfered with prisoners' religious materials. In a country with one-half million guards and 2.2 million prisoners, abuses will occur; that finding is belaboring the obvious. *See Cutter v. Wilkinson*, 544 U.S. 709 (2005).

The court restated Justice Blackman's prostitution theory of federalism; if a state accepts federal funds it waives its status as an integral and distinct component of the constitutional system. It did not articulate the role of prison religion in commerce with foreign nations. *See Garcia v. San Antonio Metropolitan Transit Authority, et al.*, 469 U.S. 528 (1985).

These people had the same rights that they had – and did not have – before Congress's act. They are not in a poor house, in a regiment abroad, or in a mental home; they are in prison, and it comes with restrictions on all liberties except conscience. Conversely, their status as felons in custody does not make them outlaws – in the common-law sense; they are due some process.

9.     *In Particular.*

This complaint, if it is converted into a direct complaint, asks for damages that they may not recover. It does not identify exact transactions or events that would support an individual

claim. The complaint, while it may be sincere, is more in the form of a position paper – not as bad as a law-review article.

The Constitution persists in requiring that the state not interfere with prisoners freely exercising their religions except as a direct, reasonably necessary, spiritually neutral consequence of its meeting other responsibilities. Prisons do not have unlimited space or guards for an infinite number of religious ceremonies. Religions prescribe days of the week and hours of the day as well as diets and dress. Those are addressed to civil society under normal circumstances. Nobody went to hell for missing Temple during the Blitz or not resting on the Sabbath during the attack on Pearl Harbor.

Prisons may ought to facilitate those aspects of civil society – like education and religion – that are consistent with the practical and functional limits of these people's earned status. Without individual facts, the court has no authority to correct a chaplain's manual that may well be modified in practice to suit the constitutional requirements. The limits on group size, volunteers, and frequency have not been shown to have been institutionally employed with either hostility or hostile rigidity.

Although the complaint seems in 53 pages to focus on group size, no volunteers, and weekly meetings, it talks a lot about drums and tobacco. Noise-making may be reasonably restricted during the prisoners' free time. Prisoners have no right to smoke. Smoking has objective harms to people in the free world, and it increases health and maintenance costs to the state in the prisons.

One of the reasons that prisoners are denied personalized dress is to disassociate them from the patterns that brought them to prison; they are standardized. Religiously preferred hair, dress, and diet are artifacts of lawful society. To the extent that religious ceremonies are consistent with secular, objective, practical, penological goals, those practices may not be curtailed.

10.     *Conclusion*

The plaintiffs have not brought themselves within the narrow range of people who are related closely enough to a judgment to enforce it. Obviously, they cannot modify it either.

Construing this case as a complaint about their civil rights, the plaintiffs have not pleaded facts that, if true, would entitle them to relief.

It will be dismissed for failing to articulate facts that constitute a legally recognized claim against this defendant and for want of jurisdiction because the plaintiffs have no standing.

Signed on April 16, 2008, at Houston, Texas.

Lynn N. Hughes
United States District Judge